**In re WHEELING–PITTSBURGH STEEL CORPORATION, et al., Debtor.**

**No. 85–00793PGH.**

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 28, 1990.

M. Bruce McCullough, Pittsburgh, Pa., for debtor.

## OPINION [1]

WARREN W. BENTZ, Bankruptcy Judge.

At the hearing held December 6 and December 8, 1990 on confirmation of the Amended Joint Plan of Reorganization ("Plan") for Wheeling–Pittsburgh Steel Corporation, Et Al ("Debtor"), the only remaining unresolved objections to confirmation of the Plan were those filed by:

   (a) U.S. Environmental Protection Agency (EPA)

   (b) U.S. Economic Development Administration and Shawmut Bank (Collectively, EDA/Shawmut)

   (c) U.S. Farmer's Home Administration and Equibank (Collectively, FMHA)

*Objection of EPA*

The Plan recognizes the EPA claims as post-petition administrative claims to be paid in full by the reorganized Debtor. The claims are in litigation in the U.S. District Court for Southern District of Ohio (filed June 1, 1988) and the U.S. District Court for the Western District of Pennsylvania (filed October 29, 1990). The

amounts due, if any, are unliquidated. The claims are for civil penalties for alleged violation of the Clean Water Act, 33 U.S.C. §§ 1311, 1321, 1344.

EPA argues that the probable civil penalties are so large that, when ascertained, the reorganized Debtor will not be able to pay them, that the penalties will necessitate a further reorganization, that a cash escrow should be now set aside for such payment or that confirmation should be denied so that distribution of cash to creditors under the Plan would be withheld until the EPA claims are established and quantified.

■ EPA's view of the law is correct in that if an administrative claim, or any other claim, is (1) unresolved and (2) of such probable magnitude as to (a) disrupt or render impossible the distributions contemplated by the Plan or (b) necessitate a further reorganization, then confirmation should be denied. *See Pizza of Hawaii, Inc.,* 761 F.2d 1374 (9th Cir.1985). *See also* 11 U.S.C. § 1129(a)(11).

Thus, we must ascertain the probable maximum magnitude of the claim and the effect of future allowance thereof upon consummation of the Plan and upon operations of the reorganized Debtor.

■ EPA first shocked the court by assertions that the potential claims were some $270,000,000. A liability of that magnitude certainly would disrupt the Plan and future operations of the reorganized Debtor. Testimony by EPA witnesses, however, indicated that the maximum civil penalty ever awarded EPA was $3.5 million, that an environmental group had once achieved a $4.2 million penalty, and that USX Corporation was fined only $1.6 million where its cost to cure the environmental harm was to be $7 million and the cost of equipment to prevent future violations was some $25 million. EPA counsel then suggested a maximum penalty here might be $25 million. There are no calculations

1. This Opinion supplements the findings made in the Confirmation Order issued December 18, 1990. This Opinion constitutes the court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052, which is made applicable to this contested matter by Bankruptcy Rule 9014.

to support such a penalty against the Debtor although EPA asserted an economic benefit to Debtor of $15.5 million, which Debtor asserted was $1.5 million.

While it was inappropriate to conduct a full trial on the EPA claim, the following facts also appeared: (1) EPA asserts some 11,500 violations (incidents of excess discharge by Debtor of pollutants into the Ohio and Monongahela Rivers as shown by Debtor's records) (2) Debtor has made and continues to make expenditures to install correcting equipment and facilities (3) EPA does not assert that Debtor's violations caused any environmental damage, and (4) the trial date for the civil penalty in the U.S. District Court for the Southern District of Ohio is April or May 1993, although a motion by EPA for summary judgment has been filed.

The above factors would not, in our view, present a case for a civil penalty as high as $25 million. However, we need not make that determination. We will accept, for purposes of ruling on the EPA objection to confirmation, the EPA suggestion that a $25 million civil penalty is possible.

Testimony as to the financial strength of the reorganized Debtor showed that it will have

(1) an equity of some $250 million

(2) cash of $50 million

(3) loan availability of $100 million

(4) projected cash generation of $35 million per year.

The $25 million maximum amount of civil penalty urged by EPA is indeed enormous. However, when measured against the financial strength of the reorganized Debtor, it is not such a liability as to substantially impair operations nor require further reorganization.

We are also concerned about the prejudicial effect of setting aside an escrow fund established on far less than a full trial. Were we to do so, either party might use the amount so set aside as indicia of the appropriate civil penalty for the alleged violations. We would be most reluctant to attempt to establish the amount of such a fund based on the record before us. We also note the absence of any precedent for such a procedure.

We also note that in the ongoing business of the Debtor, it carries some $200 million of trade accounts payable and other current liabilities. These are also post-petition liabilities and are entitled to be paid in full, just as the EPA claim. They are balanced by the Debtor's cash, accounts receivable and inventory, and, no doubt, will be paid in due course. However, each trade creditor could insist, like EPA, that at confirmation, cash be deposited in escrow to assure 100% payment. Those trade creditors have not objected and are apparently content to be paid in the ordinary course of the Debtor's business.

Based on the facts before us, it is unreasonable of EPA to request (1) that confirmation be delayed beyond April 1993 because of the forum chosen by EPA to liquidate its administrative claim or (2) that the maximum foreseeable penalty asserted by EPA should be escrowed for that length of time.

Moreover, if confirmation is now delayed after 5½ years in chapter 11, there may at a future time for a hearing on confirmation, be a new suit for new post-petition civil penalties, which could cause further years of confirmation delays.

EPA, by its questions on cross-examination, seemed to urge that confirmation should be denied unless it can be *guaranteed* payment of its claim, if and when established. We deem it incumbent upon Bankruptcy Courts to assure that operation under Chapter 11 will not incur administrative claims which cannot be paid. If the EPA claim were now fixed, provision for guarantee of payment would be required. But, since it is unliquidated and contested, we think it sufficient for confirmation of the Plan, to find that it is provided for in the Plan by recognition of continuing liability to the extent liquidated by the District Courts, and by our findings that it is likely that the reorganized Debtor will be able to pay the claim, when it is liquidated, in the ordinary course of business. Indeed, we find it highly unlikely that the reorganized Debtor will be unable to pay the claim.

The EPA objection to confirmation will therefore be dismissed.

*EDA/Shawmut Objection*

█ The EDA/Shawmut have filed a $50 million claim, as the deficiency amount of their secured loan. This resulted from a sale of their collateral (the Rail Mill) during the pendency of the bankruptcy proceeding at an amount which was $40 million less than the amount of their secured loan; EDA/Shawmut has claimed an additional $10 million in interest and costs. They also assert the claim as an administration expense payable in full.

The Plan provides for payment of this claim as an unsecured claim of $40 million, but the court increased the reserve set aside for this claim as though it were a $50 million unsecured claim, thereby providing EDA/Shawmut assurance of 71% of $50 million or $35 million, leaving a remaining amount of $15 million for which the Plan makes no provision. The availability of this $15 million, if and when required, is the focus of the EDA/Shawmut objection.

Whether or not EDA/Shawmut has an administrative claim is the subject of separate and as yet unresolved proceedings in this court *as is* the Creditors' Committee's objection seeking to eliminate entirely the EDA/Shawmut claim.

Even if EDA/Shawmut should eventually be granted its maximum recovery, (i.e., an administrative priority for the full amount of their claim) the evidence adduced by the Debtor in support of confirmation shows that the Debtor will not collapse if it has to pay the additional $15 million in the future. That $15 million, together with the EPA claim of $25 million, even if established, might force a revision in the reorganized Debtor's operations, but would not require further reorganization or impair consummation of the confirmed Plan. As with the EPA, Shawmut/EDA's objections will be dismissed.

*Objection of FMHA/Equibank*

█ Equibank is the lender of record with respect to certain Series C Pollution Control Loans and certain Series C Notes (Class 2F claims). FMHA guaranteed 90% of the Series C Loans and holds 90% of the Series C Notes. Pursuant to the Series C Loans and Notes, the objectors have a first lien on the Series C collateral which consists of the Debtor's pollution control equipment at the Debtor's steelmaking facility in Steubenville, Ohio and certain of the Debtor's coke ovens in Follansbee, West Virginia.

The principal balance on the Series C Notes is approximately $44 million dollars. The FMHA asserts that the Series C Notes are fully secured and that the holders thereof are entitled to full payment including accrued interest and attorney fees or a total of $72 million, while the Debtor asserts that the lenders are undersecured and not entitled to full payment of their secured claims. The issue of the value of the FMHA's pre-petition collateral is currently pending before this court as a separate matter and is yet unresolved.

The Plan provides two alternative choices of treatment for Class 2F, holders of the Series C Notes:

1) $33,202,000 in cash (as the amount deemed secured) and an $11,000,000 (deficiency) unsecured claim on which the holders would recover 71% (or $7,800,000) for a total recovery of $41,000,000 (i.e., each bondholder who accepts the Plan would receive 75% of the principal amount due on each bond in cash, and a Class 4A [unsecured claim] for the balance, to be paid at 71% as other unsecured claims), or

2) Cash for that portion of the Claim which the Bankruptcy Court later determines as secured and allowance of an unsecured claim as determined by the Bankruptcy Court, the whole amount to be collaterized (temporarily until payment) upon plan consummation by the cash and issuance of New Series E Senior Secured Notes in excess of the amount claimed by FMHA.

The FMHA, holder of 90% of the Series C Notes voted against the Plan, while approximately 10% of the holders voted for the Plan and elected to receive cash payment and an unsecured claim upon confirmation in the amounts provided by the Plan.

The FMHA objects to confirmation of the Plan asserting numerous objections:

1) The Plan violates the absolute priority rule.

2) The Plan discriminates unfairly.

3) The Plan is not fair and equitable.

4) Confirmation of the Plan is likely to be followed by liquidation or the need for further financial reorganization of the Debtor.

5) Series C Noteholders are not receiving the indubitable equivalent of their claims.

6) The Plan is not feasible.

We further note that on the initial day of the confirmation hearing on December 6, 1990, counsel for the FMHA objected to the taking of testimony on that date on the grounds that counsel had just received the report of the plan proponents' expert. We took the direct testimony of such expert and continued the hearing until December 8, 1990 to allow counsel for the FMHA to prepare for cross-examination and to present any witnesses desired by the FMHA.

The Debtor questioned FMHA's standing to raise objections since its maximum alleged claim is collateralized pending determination by the Court and is not dependent on Debtor's future operations. As explained in open court, since the valuation of the FMHA's pre-petition collateral has not been completed, and if Debtor's position on valuation of such collateral prevails, FMHA will have an unsecured claim and therefore has standing as an individual unsecured creditor to raise issues of absolute priority. In other words, if FMHA proves a value of its pre-petition collateral of $72,000,000 then it will be paid in full and can have no objection to treatment of other claims. However, if its pre-petition collateral is proven to have a value of less than $44,000,000, then it will have an unsecured claim in the amount of the deficiency. As an unsecured creditor it can complain that the old secured creditors are receiving more under the Plan than the value of their pre-petition collateral. We found in paragraphs 8.B.1, 2 and 3 of the Confirmation Order, however, that FMHA's position in this regard was without merit.

The Plan provides the "indubitable equivalent" of FMHA's pre-petition lien. Even if the FMHA claim is established in full at 90% of $72 million, or $64.8 million, it is provided for by payment in full in cash, secured temporarily (pending determination by the Court) by

(1) $29 million in cash and 71% of $9.9, or $7 million (a total of $36 million) under the Plan, and

(2) collaterized bonds of a value of $39.6 million.

The additional bonds necessary to provide assurance of payment to FMHA will add to the reorganized Debtor's debt service, but at a level well within its projected ability to pay.

The other varied objections of FMHA are without merit. The FMHA objections to confirmation will be dismissed.